UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

**UNITED STATES OF AMERICA**,

v.

**RUFUS WILLIAMS,**

Defendants.

Crim. No. 19-804-ZNQ-5

**OPINION**

**QURAISHI, District Judge**

**THIS MATTER** comes before the Court upon the Government's Motion Admit Defendant's Post-Arrest statements. (ECF No. 640.) The Court granted the Government's Motion on July 22, 2022. (ECF No. 803.) The Court hereby supplements its decision to grant the Government's Motion for the reasons that follow:

**I.     FACTUAL BACKGROUND**

Special Agent Laura Ahlert, Task Force Officer Matthew Scalcione, and the Defendant, Rufus Williams, testified at an evidentiary hearing on October 4, 2022. As a preliminary matter, the Court finds both Government witnesses to be credible. SA Ahlert testified she has been a special agent with the FBI for eight years. (T[1] 21:15-21.) TFO Scalcione, currently employed by Jersey City Police Department, testified he has been assigned to the FBI's Joint Terrorism Task Force for over four years. Both Government witnesses were clear, consistent, and credible.

While Defendant testified at the hearing, the Court finds such testimony was not credible. Defendant testified to self-serving facts completely contrary to the law enforcement officer's

---

[1] T refers to the transcript of the October 4, 2022 hearing.

1

testimony. Much of Defendant's testimony was not plausible considering the circumstances surrounding the search of his residence and his arrest. Defendant testified that despite him being belligerent at the time of his arrest, which is denied by both Government witnesses, only one of at least sixteen law enforcement officers escorted him to a police vehicle to be transported. (*See* T 89: 9-12, 90:6-13). Defendant testified that he observed both SA Ahlert and TFO Scalcione on the front porch of the residence, but also testified that only SA Ahlert walked him from the front porch to the vehicle. (*See id*. at 88:1-7). Additionally, Defendant testified that law enforcement officers initiated conversations with his children on the front porch. (*See id*. at 82:19-24). However, SA Ahlert testified she did not speak to any children. (*See id*. at 32:4-6.) The Court additionally finds Defendant's attempt to corroborate his own testimony with a picture of his children's baby bottle and cell phone was unsuccessful. (*See id*. at 49:24-50:4.) The photograph merely depicted a baby's bottle and a cell phone alone; no law enforcement officer appeared in the photograph. (*See id*. at 49:15-25.) Defendants' testimony was wholly contradicted by the Government witnesses, and he failed to provide any persuasive corroboration for his allegations. The Court finds Defendant's testimony not credible and directly contradicted by the believable testimony of the two Government witnesses during the hearing. The Court will therefore rely on the factual circumstances set forth by SA Ahlert and TFO Scalcione.

The following facts were elicited from the Government's witnesses:

On September 26, 2019, SA Ahlert was assigned to assist with a large arrest at 8 Wyndham in East Hampton. (T 22:22 – 23:19.) SA Ahlert was assigned as the transport agent, along with TFO Scalcione. (*Id*. at 23:20-22, 24:13-14.)

New Jersey State Police Teams Unit was the first on the scene at 8 Wyndham Drive on September 26. (*Id*. at 26:1-4.) When NJSP officers arrived on scene, SA Ahlert was stationed at

a staging location, *not* near the home. (*Id*. at 26:12-15.) SA Ahlert and TFO Scalcione began to drive towards the home around 5:05-5:07 AM in SA Ahlert's vehicle. (*Id*. at 26:16-27:3.) Upon arrival at the residence, SA Ahlert and TFO Scalcione parked across the street from the residence, slightly past the property line. (*Id*. 27:6-7.) SA Ahlert described the car as an unmarked 2013 Black Ford Edge. (T 27:9-13.)

SA Ahlert and TFO Scalcione approached the residence together. (*Id*. at 30:14-15.) SA Ahlert encountered Defendant on the front porch. (*Id*. at 32:19-20.) Upon her first encounter, she did not ask Defendant any questions. (*Id*. at 32:20-21.) TFO Scalcione physically transferred Defendant into the vehicle. (*Id*. at 33:9-12.) SA Ahlert opened the rear passenger door and TFO Scalcione placed Defendant in the rear passenger seat. (*Id*. at 36:3-6.)

Upon securing Defendant in the rear passenger's seat, SA Ahlert advised Defendant of his Miranda rights. (*Id*. at 36:5-7.) SA Ahlert pulled the Miranda warnings up on her phone so that she could read them verbatim. (*Id*. at 36:9-10.) Specifically, SA Ahlert pulled up the FD-395, which is the FBI Miranda warnings document. (*Id*. at 36:16-21.) SA Ahlert testified she asked Defendant if he understood each right. (*Id*. at 36:11.) After each right, Defendant verbally confirmed he understood by stating "Yes." (*Id*. at 36:13-14, 37:8-9.) SA Ahlert testified that she knew the warnings she gave to Defendant aligned completely with the Miranda form because she read them verbatim. (*Id*. a 37: 23-25.)

SA Ahlert memorialized the process of giving Defendant his rights by way of a reporting document, specifically, the FD-302. (*Id*. at 39:6-10.) The report documents that *Miranda* warnings were given. (*Id*. at 21-22.) SA Ahlert testified that TFO Scalcione stood to her left while she administered the *Miranda* warnings. (*Id*. at 40:1-5).

TFO Scalcione and SA Ahlert then drove Defendant to Burlington County Fire Training to do processing, roughly four to five miles away, or a ten-minute drive. (*Id*. at 41:2-9.)

During the drive, SA Ahlert testified that she had small-talk conversation with the Defendant. (*Id*. at 41:10-14.) SA Ahlert did not ask him any questions about drugs, guns, or about the case. (*Id*. at 41:16-25.) SA Ahlert testified that they conversed about family and the best way to provide for them. (*Id*. at 42:4-6.) Defendant made a comment that if there were guns, he was the type of guy that would buy guns just to get them off the street. (*Id*. at 42: 7-9.) This statement was not made in response to any question from law enforcement. (*Id*. at 43:4-7).

SA Ahlert testified that throughout her entire interaction with the Defendant, she never made threats nor promises to the Defendant. (*Id*. at 43:8-14.)

TFO Scalcione testified he was able to hear everything SA Ahlert said to the Defendant, including advisement of the *Miranda* warnings. (*Id*. at 68: 17-23.) TFO Scalcione testified that SA Ahlert accurately read the *Miranda* warnings off a cell phone. (*Id*. at 69: 1-2, 19-25.) He then testified that the Defendant verbally indicated he understood the *Miranda* rights. (*Id*. at 70:2-3.)

TFO Scalcione then testified that while transporting Defendant, Defendant initiated small talk conversation. (*Id*. at 72:2-6.) He testified that Defendant, during the small talk, stated that his entire life was surrounded by taking care of his family. TFO Scalcione's testimony was consistent with SA Ahlert's testimony that none of the conversation was elicited through questioning by either law enforcement officer. (*Id*. at 72: 10-24.) The testimony was additionally consistent in that TFO Scalcione testified that the Defendant stated that if he was in a position where someone was selling guns, he would be the type of person to buy the guns for the sole purpose of them not being in the wrong hands. (*Id*. at 73: 2-1.)

4

## II. GOVERNING LAW AND LEGAL ANALYSIS

### A. Miranda

The right against self-incrimination is guaranteed by the Fifth Amendment to the United States Constitution. U.S. Const. Amend. V. To protect a person's right against self-incrimination, a person in custody

> must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Miranda v. Arizona* 384, U.S. 436, 478-79 (1966).

The primary purpose of *Miranda* warnings is to safeguard an arrested individual's Fifth Amendment right to not speak to law enforcement. *U.S. v. Shannon*, 766 F.3d 346, 354 (3d Cir. 2014) (citing *Wainwright v. Greenfield*, 474 U.S. 284, 290 (1986)). The Supreme Court in *Miranda* held warnings were necessary in the context of *custodial interrogation*. *Moran v. Burbine,* 475 U.S. 412, 425, (1986).

It is clear here that the Defendant was in custody at the time he made inculpatory statements to police. Defendant was handcuffed and placed in the back of a police vehicle. He was seated in the back seat along with TFO Scalcione and SA Ahlert driving the vehicle. At issue, therefore, is whether Defendant was subject to interrogation at the time he made the statements.

*Miranda* safeguards come into play whenever a person in custody is subjected to either "express questioning or its functional equivalent." *Rhode Island v. Innis,* 446 U.S. 291, 300-01 (1980). "Interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police that "the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id*. at 301. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, "the definition of

5

interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response." *Id*. at 302.

The Defendant here was not subject to interrogation at the time he made the statements in question to police. Defendant, TFO Scalcione, and SA Ahlert engaged in "small talk" conversations while driving to Burlington County Fire Training. (T 71:18-19.) Specifically, SA Ahlert testified that the conversation was about "family, providing for your family in the best way" and about their children. (*Id*. at 42:4-6.) It is reasonable that police did not intend to elicit incriminating responses when conversing with the Defendant about family. Defendant's statements, however, were not made in response to any questions posed by law enforcement. (*Id*. at 42:10-15.) In fact, it was the Defendant himself who initiated the small-talk conversation with police. (*Id*. at 72:2-4.) This is corroborated by the fact that both TFO Scalcione and SA Ahlert were not involved in the investigation, were not aware of what charges Defendant was facing, and therefore, were not in a position to question Defendant about the case. (See *Id*. at 24:15–23; 76:13-15.) Their sole purpose was to transport Defendant from his residence to Burlington County Fire Training Facility for processing.

As such, Defendant was not subject to interrogation at the time he made statements to police. Therefore, Defendant's *Miranda* rights had not attached, and police were not required to issue *Miranda* warnings. Any statement made during the vehicle transport of the Defendant was not made in violation of *Miranda*.

Nevertheless, even though Miranda had not attached, both Government witnesses testified that SA Ahlert administered verbatim *Miranda* warnings to the Defendant prior to transporting him to booking. (T 37: 23-25, 69: 1-2, 19-25.) Additionally, while no written or paper *Miranda* form was administered to the Defendant, such a practice was not required. The Court would note

that here, despite the fact that the law enforcement officers did not intend to question Defendant, the best practice would have been to execute a *Miranda* form with Defendant. This can, in some circumstances, prevent the need for unnecessary motion practice and disputes concerning whether *Miranda* rights were given or waived. The dispute in the instant offense may have been avoided had the officers simply taken the time to review the written form with Defendant. That being said, such practice is not required by law and verbal advisement is sufficient. Here, even if Miranda had attached, which this Court has found it did not, such warnings were provided to Defendant.

Therefore, the Court finds that Defendant's statements were not made in violation of *Miranda*.

**B. Voluntariness**

The Court next must examine whether Defendant made these statements "voluntarily" per the Due Process Clause of the Fourteenth Amendment. The Due Process Clause of the Fourteenth Amendment bars the admission of "involuntary" confessions. *See Colorado v. Connelly*, 479 U.S. 157, 163 (1986).

The Government has the burden to prove, by a preponderance of the evidence, that a defendant's confession was voluntary, *Lego v. Twomey*, 404 U.S. 477 (1972), that it was the product of a rational intellect and a free will, and that the defendant's will was not overborne. *U.S. v. Swint*, 15 F.3d 286 (3d Cir. 1994) (citations omitted).

The constitutional requirement that an involuntary statement induced by overbearing police tactics may not be used as evidence against a defendant stemmed from the notions that involuntary statements are inherently untrustworthy, *Brown v. Mississippi*, 297 U.S. 278 (1936), and that police activity which is overbearing and coercive can offend a fundamental sense of decency, *Spano v. New York*, 360 U.S. 315 (1959). The Supreme Court's decision in *Connelly*, 479 U.S. 157, held that "coercive police activity is a *necessary* predicate to the finding that a confession is not

7

'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Id*. at 167 (emphasis added).

[C]ourts look to the totality of circumstances to determine whether a confession was voluntary. *Miller v. Fenton*, 796 F.2d 598, 604 (1986). Those potential circumstances include not only the crucial element of police coercion, the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition, and mental health. *Withrow v. Williams*, 507 U.S. 680, 693-94 (1993) (internal citations omitted). They also include the failure of police to advise the defendant of his rights to remain silent and to have counsel present during custodial interrogation. *Haynes v. Washington*, 373 U.S. 503, 516–17 (1963).

It is clear here that Defendant's statement was made free of police coercion. *See Connelly*, 479 U.S. at 167. Both Government witnesses testified that they only engaged in *small talk* conversation with the Defendant. (T 41:10-14, 72:2-6.) As stated earlier, neither Government witness was in a position to discuss the instant case, the search, or any pending charges concerning Defendant since they were not working the investigation, but rather, were only assigned transport duties. The transport between Defendant's residence and the destination was merely a 10-minute drive, or four to five miles away. (*Id*. at 41:4-8.) While discussing family, Defendant made a statement that he is a type of person to buy guns just to get them off the street. (*Id*. at 42: 7-9.) Defendant did not make this statement in response to any Government questioning. (*Id*. at 43:4-7.) Further, Defendant himself testified he was familiar with *Miranda* warnings. (*Id*. at 92:17-21.) Defendant's statement was in response to a limited small-talk discussion with law enforcement about family. In viewing the totality of circumstances, the Court finds that Defendant's statements were made voluntarily, and the police conduct did not run afoul of Due Process.

## III.   CONCLUSION

For the reasons stated above, the Court will GRANT the Government's Motion to Admit Defendant's Post-Arrest Statements at trial.

Date: **October 14, 2022**

                                         s/ Zahid N. Quraishi
                                       **ZAHID N. QURAISHI**
                                       **UNITED STATES DISTRICT JUDGE**